**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **ROBERT HUTT, and** | : | **CIVIL ACTION** |
| **JARED HUTT,** | : | |
|         **Plaintiffs,** | : | |
| | : | |
|     **v.** | : | |
| | : | |
| | : | **NO.  20-494** |
| **XPRESSBET, LLC,** | : | |
|         **Defendant.** | : | |

**DuBois, J.**                                                                 **May 28, 2020**

## M E M O R A N D U M

### I.     INTRODUCTION

Defendant Xpressbet, LLC ("Xpressbet") operates an online platform for horse race betting.  After plaintiff Robert Hutt ("Robert") opened multiple accounts with defendant, he alleges that defendant improperly disclosed his private information and the private information of his son, plaintiff Jared Hutt ("Jared"), to Pennsylvania state regulatory authorities.  Plaintiffs assert claims of breach of contract, false light invasion of privacy, invasion of privacy, and civil conspiracy.  Defendant contends that, under its website terms of use, plaintiffs' claims should be referred to arbitration.  Presently before the Court is Defendant's Motion to Compel Arbitration. For the reasons that follow, the motion is granted.

### II.     BACKGROUND

The facts summarized below are drawn from plaintiffs' Complaint.  The Court construes that complaint in the light most favorable to plaintiffs.

#### A.     Robert Hutt's Xpressbet Membership

At all times relevant to this case, Robert was a member of Xpressbet Select, an online service for wagering on horse races provided by defendant Xpressbet.  Compl. ¶ 10.  As an

Xpressbet Select member, Robert was required to wager at least $1 million per year.  *Id.*

Robert—who "is considered a 'Whale' in gaming parlance, a player who wagers large amounts of money"—joined Xpressbet Select after defendant's agents personally solicited him. *Id.* ¶ 11.  Defendant established three Xpressbet Select accounts for Robert under his own name and the names of his sons, Jared and Aaron Hutt.  *Id.* ¶ 12.  In doing so, defendant told Robert that the specific names in which the accounts were opened "did not matter" and that he could transfer money between the accounts.  *Id.* ¶ 13.  Although Robert was a New Jersey resident at the time he joined Xpressbet Select, defendant created the accounts "using" addresses in Florida. *Id.* ¶¶ 11, 14.  Plaintiffs allege that defendant established the three accounts "with full knowledge that [none of the plaintiffs] resided in the State of Florida and with full knowledge that neither Jared Hutt nor Aaron Hutt would be able to meet the $1,000,000.00 minimum for annual wagers."  *Id.* ¶ 14.  Further, plaintiffs assert that defendant established the three accounts with Florida addresses in order to circumvent New Jersey state laws and regulations that "do not allow New Jersey residents to use Xpressbet for online wagers and prohibit Xpressbet from soliciting or enrolling New Jersey residents."  *Id.* ¶ 15.

Central to the Complaint is plaintiffs' allegation that Robert "became a member of Xpressbet Select on the express promise of confidentiality regarding any and all personal information disclosed to Xpressbet."  *Id.* ¶ 16.  Defendant's agents informed Robert that "the accounts were completely confidential, that no information would be released to third parties, except in criminal or health-related matters, and only if Xpressbet was served with a subpoena, court order or search warrant."  *Id.* ¶ 17.  In addition to this oral agreement of confidentiality, plaintiffs allege that defendant "has a [P]rivacy [P]olicy which provides that Xpressbet will not use or disclose personal information to third parties absent consent of the user, except where

2

required by law." *Id.* ¶ 18.  The Privacy Policy, the only part of the written agreement between the parties to which reference is made in the Complaint, is not attached to the Complaint or Defendant's Motion to Compel Arbitration.  Plaintiffs assert that their breach of contract claims are based on the oral agreement of confidentiality and the Privacy Policy.  Pls.' Resp. 9.

Defendant's website includes a webpage titled "Terms & Conditions," which provides the terms and conditions for use of the Xpressbet site.  Copies of Part I and Part III of the Terms & Conditions are attached to defendant's motion.[1]  Part I of the Terms & Conditions, titled "Legal Requirements of Use of This Web Site," states, *inter alia*, that "Your access to, and use of, this Website is evidence of Your acceptance of the Terms of Use, the Terms of Wagering, and Privacy Policy."  Def.'s Mot. Compel Arbitration ("Def.'s Mot.") Ex. B ("Terms & Conditions Part I").  Part I includes a hyperlink to the Privacy Policy.  Part III of the Terms & Conditions is titled the "Terms of Wagering for All Users Placing Wagers," and sets forth more detailed terms for placing wagers on defendant's website.  Def.'s Mot. Ex. A ("Terms of Wagering").  The Terms of Wagering provide, in relevant part, that "[b]y opening an Account with XPRESSBET, You certify that: You have read and agree to use the Account in accordance with the instructions and conditions [of the] Terms of Wagering, or as otherwise communicated to You from time to time by XPRESSBET."  *Id.*  ¶ 1(a).

Three additional provisions of the Terms of Wagering are relevant to the Complaint and Defendant's Motion to Compel Arbitration: (1) the confidentiality clause, (2) the arbitration clause, and (3) the integration clause.  First, the confidentiality clause provides that "You

---

[1] Although Part I and Part III of the Terms & Conditions are not attached to the Complaint, the Court may consider both documents in ruling on Defendant's Motion to Compel Arbitration because plaintiffs do not contest the authenticity of the documents and they are integral to plaintiffs' claims.  *See Pension Ben. Guar. Corp. v. White Consol. Indus., Inc.*, 998 F.2d 1192, 1196 (3d Cir. 1993) (holding that "a court may consider an undisputedly authentic document that a defendant attaches as an exhibit to a motion to dismiss if the plaintiff's claims are based on the document"); *Curtis v. Cintas Corp.*, 229 F. Supp. 3d 312, 316 (E.D. Pa. 2017) (considering undisputedly authentic documents attached to a defendant's motion to compel arbitration).

acknowledge that XPRESSBET reserves the right to report unusual or suspicious activity to the proper authorities.  Additionally, You acknowledge that Xpressbet will comply with any and all regulatory and / or legal investigations, and that Xpressbet may do so with or without providing You notice regarding said investigations."  Terms of Wagering ¶ 1(j).

Second, the arbitration clause, included in Paragraph 10(f), states the following:

> At the option of XPRESSBET, disputes between You and XPRESSBET shall be resolved by an arbitration panel sitting in the State of Oregon in accordance with the rules of the American Arbitration Association and any award rendered by such an arbitration proceeding may be entered in any court of competent jurisdiction thereof.  The remedies provided in the Terms of Wagering for breach thereof by XPRESSBET or by You shall constitute the sole and exclusive remedies to the aggrieved party and any and all such remedies which might otherwise be available under the law of any jurisdiction are hereby expressly waived by both XPRESSBET and You.

*Id.* ¶ 10(f).

Third, the integration clause provides that the "Terms and Conditions, the Terms of Wagering and any related information contained in the Welcome Kit are incorporated herein by reference and collectively constitute the entire agreement between You and XPRESSBET regarding the subject matter hereof, subject to applicable law."  *Id.* ¶ 10(b).

### B.    Investigation of Jared Hutt and Initiation of This Lawsuit

In 2017, Jared worked as a licensed horse race official at the Parx Casino in Bensalem, Pennsylvania.  *Id.* ¶ 20.  During the course of Jared's employment, the Board of Stewards—a regulatory entity that oversees horse racing activities in Pennsylvania[2]—initiated an administrative investigation into Jared for improper betting activity on races between January 2017 and September 2017.  *Id.*  After the Board of Stewards investigation, Jared was "accused"

---

[2] *See* 58 Pa. Code § 163.340 (defining the powers of the stewards); *id.* § 163.342 (providing the process for reporting and investigating complaints).

of placing bets on races held at the Parx Casino while he was on duty as a race official, in violation of Pennsylvania regulations governing horse track racing. *Id.* ¶¶ 20, 23; *see also* Pa. Code § 163.335. On September 14, 2018, the Board of Stewards convened a hearing to address Jared's alleged misconduct. *Id.* ¶ 23. One month later, on October 14, 2018, the Board revoked Jared's license to work as a race official. *Id.* ¶ 24. Jared thereafter appealed the Board of Stewards decision to the Pennsylvania State Horse Racing Commission ("Horse Racing Commission"), which conducted a hearing on the appeal on February 5, 2019. *Id.* ¶ 25.

Two individuals testified at the Horse Racing Commission hearing: George Lobley, an investigator for the Commission; and Eugene Chabrier, a representative of defendant Xpressbet. Lobley testified that defendant provided him with wagering and financial information regarding the Xpressbet Select accounts established in the names of Robert, Jared, and Aaron Hutt. *Id.* ¶ 27. Lobley stated that he requested the information from defendant by telephone and that defendant provided the documents without Lobley securing a warrant, subpoena, or court order. *Id.* Defendant did not notify plaintiffs that the records associated with the three accounts were requested by, or provided to, Lobley. *Id.* ¶¶ 27, 33. Chabrier testified that the records provided by defendant were related to accounts established in the names of plaintiffs and Aaron Hutt. *Id.* ¶ 30. In addition, Chabrier testified that, while he had no independent knowledge of the manner in which the accounts were created, an Xpressbet Select user would not be able to transfer funds between the three accounts, contrary to what Robert said he was told when the accounts were first established. *Id.* ¶ 31. On April 30, 2019, the Horse Racing Commission affirmed the decision of the Board of Stewards revoking Jared's race official license. *Id.* ¶ 35.

On January 27, 2020, plaintiffs filed a Complaint asserting the following claims against defendant: breach of contract (Count I); false light invasion of privacy (Count II); invasion of

privacy (Count III); civil conspiracy (Count IV); and punitive damages (Count V).[3]  On April 6,

2020, defendant filed its Motion to Compel Arbitration (Document No. 3).  The motion is fully

briefed and ripe for decision.

## III.   APPLICABLE LAW

Questions of arbitrability are governed by the Federal Arbitration Act, 9 U.S.C. § 1 *et*

*seq*.  "The FAA manifests 'a congressional declaration of a liberal federal policy favoring

arbitration agreements.'"  *Quilloin v. Tenet HealthSystem Phila., Inc.*, 673 F.3d 221, 228 (3d Cir.

2012) (quoting *Moses H. Cone Mem'l Hosp. v. Mercury Const. Corp.*, 460 U.S. 1, 24 (1983)).  In

doing so, the FAA "requires courts to place arbitration agreements 'on equal footing with all

other contracts.'"  *Kindred Nursing Ctrs. Ltd. P'ship v. Clark*, 137 S.Ct. 1421, 1424 (2017)

(quoting *DIRECTV, Inc. v. Imburgia*, 136 S.Ct. 463, 468 (2015)).  Arbitration agreements are

"valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the

revocation of any contract."  *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 339 (2011)

(quoting 9 U.S.C. § 2)).

When deciding a motion to compel arbitration under the FAA, courts engage in a two-

step inquiry into "(1) whether there is a valid agreement to arbitrate between the parties and, if

so, (2) whether the merits-based dispute in question falls within the scope of that valid

agreement."  *Flintkote Co. v. Aviva PLC*, 769 F.3d 215, 220 (3d Cir. 2014) (quoting *Century*

*Indem. Co. v. Certain Underwriters at Lloyd's, London*, 584 F.3d 513, 527 (3d Cir. 2009)).  In

assessing whether the dispute falls within the scope of the valid arbitration agreement, the Court

applies a "presumption of arbitrability."  *Century Indem. Co.*, 584 F.3d at 524 (quoting *AT & T*

*Techs., Inc. v. Comm. Workers of Am.*, 475 U.S. 643, 650 (1986)).  Under that presumption, "an

---

[3] The Court notes that there is no cause of action for punitive damages.  However, because Defendant's Motion to Compel Arbitration is granted, the Court does not dismiss the punitive damages count.

order to arbitrate the particular grievance should not be denied unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute." *Id.* If the Court determines that an enforceable arbitration agreement exists, and that the dispute falls within the scope of the agreement, the FAA requires that the matter be referred to arbitration proceedings. 9 U.S.C. § 3.

## IV.    LEGAL STANDARD

Depending on the nature of the complaint and its supporting documents, a motion to compel arbitration may be evaluated under either the standard set forth in Rule 12(b)(6) or Rule 56 of the Federal Rules of Civil Procedure. *See Guidotti v. Legal Helpers Debt Resolution, L.L.C.*, 716 F.3d 764, 773–76 (3d Cir. 2013). The Third Circuit has held that, "when it is apparent, based on 'the face of a complaint, and documents relied upon in the complaint,' that certain of a party's claims 'are subject to an enforceable arbitration clause, a motion to compel arbitration should be considered under a Rule 12(b)(6) standard without discovery's delay.'" *Id.* at 776 (quoting *Somerset Consulting, LLC v. United Capital Lenders, LLC*, 832 F. Supp. 2d 474, 482 (E.D. Pa. 2011)). In contrast, "if the complaint and its supporting documents are unclear regarding the agreement to arbitrate, or if the plaintiff has responded to a motion to compel arbitration with additional facts sufficient to place the agreement to arbitrate in issue," the parties are entitled to discovery on the issue of arbitrability and the Court applies the standard under Rule 56. *Id.*

In this case, the parties do not dispute that Rule 12(b)(6) sets forth the appropriate standard for deciding Defendant's Motion to Compel Arbitration. As discussed *infra,* the Complaint and supporting documents submitted with defendant's motion are sufficiently clear to establish that a valid agreement to arbitrate exists. *See Guidotti*, 716 F.3d at 776; *Morina v.*

*Neiman Marcus Grp., Inc.*, No. CIV.A. 14-1394, 2014 WL 4933022, at *8 (E.D. Pa. Oct. 1, 2014).  Moreover, plaintiffs have failed to allege any additional facts in their response that place the existence of a valid arbitration agreement in issue.  *See Guidotti*, 716 F.3d at 776.  Accordingly, the Court applies the Rule 12(b)(6) standard to Defendant's Motion to Compel Arbitration.

Under the Rule 12(b)(6) standard, the Court assesses the legal sufficiency of the complaint.  *See Waterfront Renaissance Assocs. v. City of Phila.*, 701 F. Supp. 2d 633, 639 (E.D. Pa. 2010).  To survive a motion to dismiss, the plaintiff must allege "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.* at 678.  In assessing the plausibility of the plaintiff's claims, a district court first identifies those allegations that constitute nothing more than mere "legal conclusions" or "naked assertion[s]."  *Twombly*, 550 U.S. at 557, 564.  Such conclusory allegations are "not entitled to the assumption of truth."  *Iqbal*, 556 U.S. at 679.  The Court then assesses "the 'nub' of the plaintiff['s] complaint—the well-pleaded, nonconclusory factual allegation[s]"—to determine whether it states a plausible claim for relief.  *Id.* at 680.  "In deciding a Rule 12(b)(6) motion, a court must consider only the complaint, exhibits attached to the complaint, matters of public record, as well as undisputedly authentic documents if the complainant's claims are based upon these documents."  *Mayer v. Belichick*, 605 F.3d 223, 230 (3d Cir. 2010).

## V.     DISCUSSION

Defendant argues that (1) the parties entered into a valid arbitration agreement and (2) the claims set forth in plaintiffs' Complaint fall within the scope of the arbitration clause.  The Court addresses each argument in turn and concludes that the arbitration clause is valid and applicable to each of plaintiffs' claims.

### A.     A Valid Arbitration Agreement Exists[4]

The threshold issue of whether a valid arbitration agreement exists is determined by applying state law contract principles.  *China Minmetals Materials Imp. & Exp. Co. v. Chi Mei Corp.*, 334 F.3d 274, 290 (3d Cir. 2003).  Under Pennsylvania law,[5] the party seeking arbitration bears "the burden of demonstrating that a valid agreement to arbitrate exists between the parties."  *Goldstein Depository Trust Co.*, 717 A.2d 1063, 1067 (Pa. Super. Ct. 1998).  Such arbitration agreements "are upheld only where it is clear that the parties have agreed to arbitrate in a clear and unmistakable manner."  *Quiles v. Fin. Exch. Co.*, 879 A.2d 281, 287 (Pa. Super. Ct. 2005).  Specifically, a valid contract requires that (1) both parties manifest intent to be bound

---

[4] Plaintiffs allege that "[u]pon information and belief, Xpressbet created [the Hutts' three accounts] to avoid the laws and regulations of the State of New Jersey, which do not allow New Jersey residents to use Xpressbet for online wagers and prohibit Xpressbet from soliciting or enrolling New Jersey residents."  Compl. ¶ 15.  That statement raises a question as to whether the contract between defendant and plaintiffs is illegal and, as such, unenforceable.  *See, e.g.*, *Am. Ass'n of Meat Processors v. Cas. Reciprocal Exch.*, 588 A.2d 491, 495 (Pa. 1991) (applying "the general rule that an agreement which violates a provision of a statute, or which cannot be performed without violation of such a provision, is illegal and void" (quoting *Dippel v. Brunozzi*, 74 A.2d 112, 114 (Pa. 1950))).  The Court does not address this issue because, under federal arbitration law, "unless the [plaintiff's] challenge is to the arbitration clause itself, the issue of the contract's validity is considered by the arbitrator in the first instance."  *Buckeye Check Cashing, Inc. v. Cardegna*, 546 U.S. 440, 446 (2006); *see also Rent-A-Center, W., Inc. v. Jackson*, 561 U.S. 63, 70 (2010) (noting that challenges to the legality of the contract as a whole are "not relevant to a court's determination whether the arbitration agreement at issue is enforceable").

[5] While the Terms of Wagering include a choice-of-law provision identifying Oregon law, Terms of Wagering ¶ 10(f), "[i]t would be anomalous to apply a contract's choice of law provision unless it has first been ascertained that the disputed contract exists," *Hite v. Lush Internet Inc.*, 244 F. Supp. 3d 444, 450 n.3 (D.N.J. 2017).  In determining whether a valid arbitration agreement exists in this case, the Court applies the law of the forum state, Pennsylvania, because there is no conflict between Pennsylvania law and Oregon law with respect to the issues raised in defendant's motion.  *See Hammersmith v. TIG Ins. Co.*, 480 F.3d 220, 229 (3d Cir. 2007) (summarizing Pennsylvania's two-step choice of law framework and noting that, if no conflict exists between the laws of two jurisdictions, courts may refer to both states' laws interchangeably).  On this issue, the Court notes that the parties rely on Pennsylvania contract law in their briefs.

by the agreement; (2) the terms of the agreement are sufficiently definite to be enforced; and (3) there is consideration.  *See Blair v. Scott Specialty Gases*, 283 F.3d 595, 603 (3d Cir. 2002) (applying Pennsylvania law).  The arbitration clause satisfies each of these three elements.

In their response to defendant's motion, plaintiffs only dispute the first element—arguing that they never manifested intent to enter the arbitration agreement because "there was no discussion or notice of specific terms of wagering[,] . . . terms and conditions for the use of Xpressbet's websites or arbitration provisions which would apply to disputes with Xpressbet." Pls.' Resp. 9.  This argument is rejected.

The Court concludes that the arbitration clause is a "clear and unmistakable," and therefore valid, agreement to arbitrate.  *Quiles*, 879 A.2d at 287.  The arbitration clause unambiguously states that "[a]t the option of XPRESSBET, disputes between You and XPRESSBET shall be resolved by an arbitration panel sitting in the State of Oregon in accordance with the rules of the American Arbitration Association."  Terms of Wagering ¶ 10(f). Plaintiffs' argument that they were not put on adequate notice on the ground that defendant did not mention an arbitration provision in preliminary discussions fails because "failure to read a contract does not excuse a party from being bound by its terms."  *Schwartz v. Comcast Corp.*, 256 F. App'x 515, 520 (3d Cir. 2007); *see also Simeone v. Simeone,* 581 A.2d 162, 165 (Pa. 1990) ("Contracting parties are normally bound by their agreements, without regard to whether the terms thereof were read and fully understood and irrespective of whether the agreements embodied reasonable or good bargains.").

Pursuant to Part I of the Terms & Conditions and Paragraph 1(a) of the Terms of Wagering, Robert—by virtue of opening accounts and using the Xpressbet website—agreed to the Terms of Wagering, which include the arbitration clause in dispute.  Terms & Conditions

10

Part I; Terms of Wagering ¶ 1(a).  At a minimum, Robert had reasonable notice that the Terms of Wagering—available on the Xpressbet website—governed his use of the website.  *See Schwartz*, 256 F. App'x at 520.  Therefore, by using the Xpressbet website, he assented to the arbitration clause in the Terms of Wagering.

The remaining issue is whether Jared, like his father, is bound by the arbitration clause. The proposition that Jared is bound by a legal agreement with defendant is central to plaintiffs' breach of contract claim in Count I of the Complaint.  Specifically, the Complaint alleges that (1) defendant made oral promises of confidentiality applicable to both plaintiffs; (2) "Xpressbet's . . . [P]rivacy [P]olicy also appl[ies] to Plaintiff Jared Hutt in that an Xpressbet account was opened in his name"; and (3) all of "[t]he parties entered into a Contract which governs the terms and conditions of Plaintiffs' use of Xpressbet and Xpressbet's obligations to Plaintiffs' users of Xpressbet's online wagering service."  Compl. ¶¶ 19, 38, 39.  Plaintiffs argue that, rather than arising under the Terms of Wagering, their contract claim is based on the oral confidentiality agreement with defendant and defendant's Privacy Policy, neither of which includes an agreement to arbitrate.  Pls.' Resp. 9.

The Court rejects this argument regarding the bases of plaintiffs' contract claim and concludes that Jared is bound by the arbitration clause.  The Terms of Wagering include an integration clause, demonstrating that it and the various referenced writings—including the Privacy Policy—constitute the entire agreement between the parties.  Terms of Wagering ¶ 10(b); *see also Yocca v. Pittsburgh Steelers Sports, Inc.*, 854 A.2d 425, 436 (Pa. 2004) (holding that an integration clause is a "clear sign" that a writing represents the entire agreement between the parties).  For this reason, any informal oral confidentiality agreement reached between the parties regarding the use of the Xpressbet website while defendant was soliciting Robert is

impermissible parol evidence.  Under the parol evidence rule, "[o]nce a writing is determined to be the parties' entire contract,"—in other words, that it is fully integrated—"evidence of any previous oral or written negotiations or agreements involving the same subject matter as the contract is almost always inadmissible to explain or vary the terms of the contract."  *Id.* at 436–37 (Pa. 2004); *see also 1726 Cherry St. P'ship by 1726 Cherry St. Corp. v. Bell Atl. Properties, Inc.*, 653 A.2d 663, 665 (Pa. Super. Ct. 1995) (holding that an integration clause makes the "parol evidence rule particularly applicable") (internal quotation marks omitted).  Plaintiffs' efforts to present defendant's alleged promises of confidentiality as a separate, standalone contract thus fail.  Based on the Complaint and documents attached to defendant's motion on which plaintiffs' claims are based, the only contract between plaintiffs and defendant is the Terms & Conditions, which include the arbitration clause in the Terms of Wagering and the Privacy Policy referenced in Part I of the Terms & Conditions.

In making this determination, the Court notes that the Complaint makes no mention of execution of any agreement between Jared and defendant.  Jared is nonetheless bound by the arbitration clause in the Terms of Wagering under the theory of equitable estoppel.  Courts bind non-signatories to arbitration clauses when the non-signatory "knowingly exploits the agreement containing the arbitration clause despite having never signed the agreement."  *E.I. DuPont de Nemours & Co. v. Rhone Poulenc Fiber & Resin Intermediates, S.A.S.,* 269 F.3d 187, 199 (3d Cir. 2001).  Such exploitation includes circumstances, as in this case, in which a "non-signatory embraces a contract by 'seeking to enforce terms of that contract or asserting claims based on the contract's other provisions,' and then 'turn[s] its back on the portions of the contract . . . that it finds distasteful.'"  *Sanford v. Bracewell & Guiliani, LLP*, 618 F. App'x 114, 118 (3d Cir. 2015) (quoting *Griswold v. Coventry First LLC*, 762 F.3d 264, 272 (3d Cir. 2014); *Flintkote Co. v.*

*Aviva PLC*, 769 F.3d 215, 221 (3d Cir. 2014)).  In this regard, the doctrine of equitable estoppel

bars a non-signatory from "cherry-picking" the provisions of a contract that it finds beneficial

and disregarding provisions it "would prefer not to be governed by," such as an arbitration

clause.  *Invista S.A.R.L. v. Rhodia, S.A.*, 625 F.3d 75, 85 (3d Cir. 2010).  Jared's attempt to assert

a contract claim under the Privacy Policy and avoid application of the arbitration clause

constitutes such impermissible "cherry-picking."  The Court therefore concludes that he is also

bound by the arbitration clause.

### B.      Plaintiffs' Claims Fall Within the Scope of the Arbitration Clause

Having determined that a valid arbitration clause binds the parties, the Court considers

whether the arbitration clause applies to each of the claims asserted in plaintiffs' Complaint.  At

this step of the inquiry, when evaluating the scope of an arbitration clause, the Court applies

"general state-law principles of contract interpretation," but gives "due regard" to "the federal

policy favoring arbitration."  *In re Remicade (Direct Purchaser) Antitrust Litig.*, 938 F.3d 515,

520 (3d Cir. 2019) (quoting *Jaludi v. Citigroup*, 933 F.3d 246, 255 (3d Cir. 2019)).  When

"'assessing whether a particular dispute falls within the scope of an arbitration clause,' a court

looks not to the labels or legal theories attached to the claims, but rather it must 'focus[] on the

factual underpinnings of the claim.'"  *Medversant Techs., LLC v. Leverage Health Sols., LLC*,

114 F. Supp. 3d 290, 297 (E.D. Pa. 2015) (quoting *CardioNet, Inc. v. Cigna Health Corp.*, 751

F.3d 165, 173 (3d Cir. 2014)).

The Court begins with the contractual language at issue.  The arbitration clause covers

"disputes between You and XPRESSBET," without any restrictions on the nature of the covered

disputes.  Terms of Wagering ¶ 10(f).  Given this broad scope, the presumption in favor of

arbitration is "particularly applicable."  *Battaglia v. McKendry*, 233 F.3d 720, 725 (3d Cir.

2000).  Under that presumption, if the allegations underlying plaintiffs' claims "touch matters" covered by the arbitration clause, "those claims must be arbitrated," regardless of whether they are asserted as contract or tort claims.  *Brayman Constr. Corp. v. Home Ins. Co.*, 319 F.3d 622, 626 (3d Cir. 2003) (internal quotation marks and citation omitted).

In this case, plaintiffs' contract and tort claims are based on factual allegations regarding Robert's use of defendant's website, defendant's collection of plaintiffs' personal information, and defendant's allegedly improper disclosure of that information.  This conduct is central to the contractual relationship between the parties and expressly addressed in the confidentiality clause, which permits defendant to, *inter alia*, "comply with any and all regulatory and / or legal investigations . . . with or without providing . . . notice regarding said investigation(s)."  *Id.* ¶ 1(j).  Plaintiffs' claims thus arise under the Terms of Wagering and fall within the broad scope of the arbitration clause.  The Court therefore concludes that plaintiffs must arbitrate the claims set forth in their Complaint under the provisions of the arbitration clause in the Terms of Wagering.

### C.     Dismissal of Plaintiffs' Complaint is Appropriate

Given the conclusion that plaintiffs' claims should be arbitrated, the Court must determine whether a stay or dismissal of this case is appropriate.  The FAA "affords district courts no discretion to dismiss a case where one of the parties applies for a stay pending arbitration."  *Lloyd v. Hovensa*, 369 F.3d 263, 269 (3d Cir. 2004).  However, because no non-arbitrable claims remain and neither plaintiffs nor defendant have requested a stay, the Court dismisses plaintiffs' Complaint.  *See Noye v. Johnson & Johnson*, No. 1:15-CV-2382, 2020 WL 1082605, at *7 (M.D. Pa. Mar. 5, 2020); *Somerset Consulting, LLC*, 832 F. Supp. 2d at 490.  The dismissal is without prejudice to plaintiffs' right to raise their claims in arbitration.

**VI.    CONCLUSION**

For the foregoing reasons, the Court grants Defendant's Motion to Compel Arbitration. The Court refers plaintiffs' claims to arbitration and dismisses the Complaint without prejudice to plaintiffs' right to raise in arbitration the claims asserted in the Complaint.  An appropriate order follows.